# RECORD NO. 13-2055

## In The
# United States Court Of Appeals
# For The Fourth Circuit

## JESSICA L. COOPER,

*Plaintiff - Appellee,*

**v.**

## ANTHONY A. LIPPA, JR.; MARSHALL M. ELLETT,

*Defendants – Appellants,*

and

**PATRICK H. BLASIOL; FONDA L. BRENNAN; WARNER D. LIPSCOMB,**

*Defendants.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT RICHMOND**

————————————————

## BRIEF OF APPELLEE

————————————————

**David R. Simonsen, Jr.**
ATTORNEY AT LAW
**8003 Franklin Farms Drive, Suite 131**
**Richmond, Virginia 23229-5107**
**Tel: (804) 285-1337**
**Fax: (804) 285-1350**
**Email: DSimonsenJ@aol.com**

*Dated: December 12, 2013*                    *Counsel for Appellee*

*Gibson*Moore Appellate Services, LLC
421 East Franklin Street ♦ Suite 230 ♦ Richmond, VA 23219
804-249-7770 ♦ www.gibsonmoore.net

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __13-2055__    Caption: __Cooper v. Lippa, et al._____

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Jessica L. Cooper_____
(name of party/amicus)

_____

who is _____Appellee_____, makes the following disclosure:
        (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                              ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                        ☐ YES ☑ NO
      If yes, identify all such owners:

- 1 -

4.      Is there any other publicly held corporation or other publicly held entity that has a direct
financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected
substantially by the outcome of the proceeding or whose claims the trade association is
pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: __s/David R. Simonsen, Jr._____    Date: ___September 6, 2013___

Counsel for: __Appellee Jessica L. Cooper_____

## CERTIFICATE OF SERVICE
*****************************

I certify that on __September 6, 2013__ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

__s/David R. Simonsen, Jr._____          _____September 6, 2013_____
        (signature)                                            (date)

## **Table of Contents**

**Page**

Table of Authorities...........................................ii

A.   Jurisdictional Statement...................................1

     1.  Original Jurisdiction in the District Court..........1

     2.  No Appellate Jurisdiction in this Court..............1

B.   Issue Presented for Review................................2

C.   Statement of the Facts....................................2

D.   Summary of the Argument..................................17

F.   Argument.................................................18

     This Court lacks jurisdiction of this interlocutory
     appeal because the District Court correctly held that
     genuine issues of material fact precluded summary
     judgment.................................................18

          1.   Standard of Review ........................... 18

          2.   Argument ..................................... 19

H.   Conclusion...............................................23

I.   Request for Oral Argument................................23

Certificate of Compliance

Certificate of Filing and Service

## <u>Table of Authorities</u>

**Page(s)**

**Cases:**

*Hensley v. Koller,*
    722 F.3d 177 (4th Cir. 2013)............................1, 18

*Johnson v. Caudill,*
    475 F.3d 645 (4th Cir. 2007) ........................... 18

*Mitchell v. Forsyth,*
    472 U.S. 511 (1985).......................................1

*Waterman v. Batton,*
    393 F.3d 471 (4th Cir. 2005) ........................... 18

*Winfield v. Bass,*
    106 F.3d 525 (4th Cir. 1997) ........................... 18

**Statutes:**

28 U.S.C. § 1331...............................................1

28 U.S.C. § 1343...............................................1

28 U.S.C. § 1367...............................................1

42 U.S.C. § 1983...............................................1

## A.  Jurisdictional Statement

### 1.  Original Jurisdiction in the District Court

Pursuant to 42 U.S.C. § 1983, plaintiff-appellee Jessica L. Cooper ("Cooper") seeks damages against defendant-appellants Anthony A. Lippa, Jr. ("Lippa") and Marshall M. Ellett ("Ellett"), in their individual capacities, for the malicious prosecution, false arrest, and wrongful seizure of Cooper, all of which denied Cooper rights guaranteed to her under the Constitution of the United States.  Cooper also asserts a cause of action against Lippa and Ellett for malicious prosecution under the common law of Virginia.

The District Court has original jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343 and, with regard to the common law claim of malicious prosecution, 28 U.S.C. § 1367.

### 2.  No Appellate Jurisdiction in this Court:

This Court lacks jurisdiction over this interlocutory appeal because the District Court's denial of Defendants' motion for summary judgment based on a claim of qualified immunity was fact based.  Defendants set forth no pure issue of law appealable to this Court on an interlocutory basis.

This Court has jurisdiction only if Defendants' "assertion of qualified immunity from suit presents purely legal questions." *Hensley v. Koller,* 722 F.3d 177, 181 (4th Cir. 2013), *citing Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

- 1 -

### B. <u>Issue Presented for Review</u>

**Whether this Court lacks jurisdiction of this interlocutory appeal because genuine issues of material fact preclude summary judgment.**

### C. <u>Statement of the Facts</u>

The District Court's Memorandum Opinion set forth a comprehensive review of the material facts relevant to this action, explaining the genuine disputes of material fact that precluded entry of summary judgment in favor of Defendants on the basis of qualified immunity. *See* Mem. Op., J.A. 567-87.[1]

Defendants' statement of facts as set forth in their opening brief improperly states alleged "facts"; that is, Defendants state alleged "facts" in the light most favorable to Defendants. For example, the first of Defendants' statement of facts is:

> Sometime in June 2010, Deputy Ellett was assigned to investigate one Abranda Walker's claim that Ms. Cooper swung a hatchet at her during an incident on June 5[th] [2010].

Def. Op. Brief at 3. This is not an accurate statement of fact. The District Court held:

> What is clear is that Ellett was assigned to the attempted malicious wounding case on July 7, 2010, which is the same date he sought the indictment and over one month after the June 5, 2010 incident.

Mem. Op. at 14-15, J.A. 580-81. The District Court found that the date of Ellett's assignment on July 7, 2010, was "clear," at least for purposes of considering Defendants' motion for summary judgment. *See* Mem. Op. at 4, n.7, J.A. 570. The fact that Ellett caused Cooper's indictment for a felony charge of attempted

---

[1] The District Court's Memorandum Opinion of August 9, 2013, is referred to in this brief as "Mem. Op." The Joint Appendix is referred to in this brief as "J.A."

malicious wounding on the same day of his assignment to the charge, both on July 7, 2010, certainly calls into question what "investigation" Ellett conducted or could have conducted before obtaining the indictment.

The genuine disputes of material fact that the District Court found included whether Ellett, before initiating the criminal prosecution of Cooper on July 7, 2010, and before arresting Cooper on July 14, 2010, had conducted any investigation of any kind or possessed any facts on which to base a probable cause finding to support his initiation of the criminal prosecution of Cooper for the attempted malicious wounding of Abranda Walker. *See, e.g.,* Mem. Op. at 16, J.A. 582. In particular, the District Court noted that a material fact in question was what the alleged "written statement" of Walker contained. Mem. Op., at 16, J.A. 582. The District Court could not resolve the question because the record neither contained the alleged "written statement" of Walker nor any clear explanation of what the alleged "written statement" contained. *Id.*

Background Facts

Cooper ended a social relationship with Patrick Blasiol, a Deputy in the employ of Lippa in the Caroline County Sheriff's Office, in the summer of 2008. Cooper Dec. ¶ 2, J.A. 240. Deputy Blasiol was upset about the end of the relationship and threatened Cooper that deputies in the Caroline County Sheriff's Office would charge or arrest Cooper without regard to probable cause. *Id.* ¶ 3, J.A. 240. Deputy Blasiol and other deputies of the Caroline County Sheriff's Office made good Deputy Blasiol's threat. *Id.* ¶¶ 4,5,6, J.A. 240-41.

- 3 -

In January 2009, Cooper complained to deputies in the Sheriff's Office and Lippa himself about the execution of Deputy Blasiol's threat. Cooper played for Lippa a tape recording of Deputy Blasiol threatening Cooper. Lippa did nothing. *Id.* ¶¶ 6,7,8,9, J.A. 240-41. Cooper then appealed for help to Tony Spencer, the Commonwealth's Attorney of Caroline County ("CA Spencer"). *Id.* ¶¶ 10,11, J.A. 241. In January 2009, CA Spencer personally heard the audio recording of Deputy Blasiol threatening to have charges brought against Cooper without any concern for probable cause or guilt. Spencer Dep. at 17, line 9 to 20, line 15, J.A. 256-59; *see generally* Spencer Dep. at 11, line 1 to 30, line 25, J.A. 250-59; *also* Spencer Notes, J.A. 523-27. After talking with Cooper, CA Spencer believed that Deputy Blasiol and his fellow deputies had made good on Deputy Blasiol's threats and that Cooper was being charged improperly. *Id.* CA Spencer accordingly dismissed charges brought against Cooper by deputies in the employ of Lippa by means of motions of *nolle prosequi*. Cooper Dec. ¶ 15, J.A. 242.

In Lippa's view, CA Spencer was improperly interfering with the charges that Lippa's deputies were bringing against Cooper. Lippa eventually asked the Attorney General of Virginia and the Virginia State Police to conduct investigations of CA Spencer. *See* Lippa Dep. at 46, line 15 to 49, line 6, J.A. 312-15. The investigations either did not occur or resulted in no action. *Id.*

As a result of his view of CA Spencer's interference with his office, Lippa began a baseless and malicious attack on the integrity and character of CA Spencer, falsely accusing CA Spencer

of trading the dismissal of criminal charges brought against Cooper for sex from Cooper.  *See, e.g.,* Lipscomb Dep. at 31, line 25 to 35, line 8, J.A. 285-89; Fedder Dep. at 29, line 12 to 32, line 1, J.A. 302-05; *generally* Eichenmiller Dep. at 7, line 7 to 8, line 3, J.A. 532-33.

Lippa expressly accused CA Spencer of "having sex with Jessica Cooper" in his letter to CA Spencer dated October 12, 2009.  J.A. 528-30.  At his deposition in this action, on October 25, 2012, Lippa stated that he came "to the belief that Tony Spencer was having a sexual relationship with Jessica Cooper ... probably two or three months afterwards ... after the January [2009] meeting" between Lippa and Cooper.  Lippa Dep. at 22, lines 2-18, J.A. 308. CA Spencer and Cooper deny that they have ever had any sexual contact of any kind.  Spencer Dep. at 87, lines 3-10, J.A. 272; Cooper Dep. at 90, lines 1-3, J.A. 340.

Lippa wanted criminal charges brought against Cooper regardless of the existence of probable cause for the charges, in part to see what CA Spencer would do.  *See* Fedder Dep. at 30, line 20 to 32, line 1, J.A. 303-05; *generally* Fedder Dep. at 14, line 8 to 21, line 22, J.A. 292-99; at 25, line 22 to 26, line 3, J.A. 300-01.  Lippa believed and stated to his deputies that if CA Spencer continued to dismiss charges against Cooper, it would provide proof that CA Spencer and Cooper were having an improper sexual relationship.  *See* Lippa Dep. at 22, lines 2-10, J.A. 308; at 24, line 4 to 26, line 6, J.A. 309-11.  Lippa established the policy of bringing of criminal charges against Cooper without regard to probable cause or guilt as an unwritten policy of his

- 5 -

office. *See* Fedder Dep. at 30, line 20 to 32, line 1, J.A. 303-05*; generally* Fedder Dep. at 14, line 8 to 21, line 22, J.A. 292-99; at 25, line 22 to 26, line 3, J.A. 300-01.

<u>Ellett's Initiation of the Criminal Prosecution</u>

On June 5, 2010, Cooper arrived in her vehicle at the residence of Thomas Reynolds on Ladysmith Road in Caroline County. *See* Cooper Dec. ¶¶ 34-37, J.A. 244. Present outside the residence were Brian Pitts, the infant child of Cooper and Pitts, Tina Taylor (Pitts' mother), Abranda Walker, and the infant child of Walker and Reynolds. *Id.* After both Cooper and Walker had made 9-1-1 calls requesting a police response, Sergeant McCarty and Deputy Eichenmiller of the Caroline County Sheriff's Office responded to the Reynolds residence. At the scene, Sergeant McCarty and Deputy Eichenmiller arrested Cooper for domestic assault because she admitted that she had inadvertently scratched Pitts as he had pushed her back into her vehicle as she had tried to exit her vehicle on arrival. Cooper Dec. ¶¶ 38-39, J.A. 244. The charge of domestic assault against Cooper because of her scratching of Pitts was dismissed when Pitts testified at the trial on July 27, 2010 that on June 5, 2010, Abranda Walker had deliberately scratched Pitts more deeply than the inadvertent scratches Cooper had caused, in order to support the charge of domestic assault against Cooper. *See generally* Cooper Dec. 38, J.A. 244; Trial Tr.[2] at 93-94, J.A. 450-51 (Testimony of Pitts).

---

[2] The transcript of the trial of Cooper for the attempted malicious wounding of Abranda Walker, held on December 1, 2010, set forth in the Joint Appendix at pages 358 to 382, is referred to in this brief as "Trial Tr. at ____."

On June 5, 2010, no one told Sergeant McCarty or Deputy Eichenmiller that Cooper had swung a hatchet at Abranda Walker's head or had otherwise committed the crime of attempted malicious wounding.  Cooper was not charged with the crime of attempted malicious wounding on June 5, 2010.  Cooper Dec. ¶ 39, J.A. 244. Neither Sergeant McCarty nor Deputy Eichenmiller ever reported or alleged that Cooper had committed the crime of attempted malicious wounding nor did they charge her with any such crime.

Walker's statement to the 9-1-1 operator on June 5, 2010, included in pertinent part:

> Jessica Cooper just got up and got out of the vehicle, ran up to me, and punched me in the face.

Trial Tr. at 23, J.A. 380.  This was the statement that Walker made shortly after Cooper arrived at the Reynolds residence on June 5, 2010.  At the trial on December 1, 2010, Walker claimed that she had lied to the 9-1-1 operator when speaking from the scene on June 5, 2010, but was telling the truth at later times (including at trial), when she accused Cooper of swinging a hatchet at her head.  *See* Trial Tr. at 35, J.A. 392.  Ellett's investigative notes of his interview with Walker make no mention of Walker's "lie" to the 9-1-1 operator, although Ellett does reference the fact of a 9—1-1 call.  CCSO-35, J.A. at 347.  At his deposition, Ellett denied having heard the 9-1-1 recordings before initiating the criminal prosecution of Cooper and claimed that he could not recall if he ever had heard the 9-1-1 recordings. Ellett Dep. at 17, line 22 to 18, line 2, J.A. 495-96.  At his deposition, Ellett had no answer for why he would not have

- 7 -

listened to the 9-1-1 recordings before initiating the criminal prosecution of Cooper. Ellett Dep. at 19, line 17 to 20, line 1, J.A. 497-98. If Ellett were to admit that he heard the 9-1-1 recordings, he would have to explain why throughout the time he was assigned to the case on July 7, 2010, through the day of trial on December 1, 2010, he had ignored Walker's statement to the 9-1-1 operator that Cooper had punched her in the face, as opposed to trying to hit her in the head with a hatchet.[3]

On July 7, 2010, the Caroline County Sheriff's Office assigned Abranda Walker's alleged complaint of attempted malicious wounding against Cooper to Ellett.[4]  Ellett Dep. at 19, lines 4-5, J.A. 497.  On the same day, July 7, Ellett initiated the criminal prosecution of Cooper for the attempted malicious wounding of Walker. *See* Mem. Op. at 4, J.A. 570.  In his deposition, Ellett essentially admitted that he lacked probable cause at the time he initiated the criminal prosecution.  Ellett stated at his deposition that without corroboration from someone other than Walker, he would not have charged Cooper.  Ellett testified:

---

[3] At oral argument before the District Court on Defendants' motion for summary judgment, Defendants' counsel appeared to suggest that Ellett had listened to the 9-1-1 recordings, although he proposed no date for such listening.  Oral Argument before the District Court on August 5, 2013, J.A. 563-64.  If Ellett did listen to the 9-1-1 recordings at any time before the trial on December 1, 2010, Ellett's failure to take account of Walker's statements to the 9-1-1 operator is evidence of Ellett's willingness to pursue a criminal charge against Cooper without probable cause.

[4] Given the undisputed evidence of Lippa's interest in any contact that his deputies had with Cooper, it is inconceivable that Lippa was not involved in the assignment of the attempted malicious wounding charge to Ellett.

> - I can't be any more clear about this case, is if it had
> just come down to Ms. Walker's statements against Cooper
> and there hadn't been anything to corroborate Ms.
> Walker's statements, I wouldn't have been looking for
> probable cause because, quite frankly, I'm sorry, but if
> the victim and suspect are about equal as far as their
> criminal histories is concerned and as far as everything
> else, that's not probable cause in my book.  If you've
> got corroborative statements and some corroborative
> evidence, then that makes a difference.  If it had been
> just Ms. Walker, this case would never had been charged.

Ellett Dep. at 46, line 21 to 47, line 8, J.A. 520-21.

The evidence establishes that at the time of Ellett's presentation of the case to the Grand Jury on July 7, 2010, Ellett did not have any corroborative statements.  Indeed, there is no clear evidence that Ellett was in possession of any written statement from Walker on July 7, 2010.  Ellett's investigative notes state:

> WALKER signed a written statement regarding her complaint
> and the facts attested to by WALKER were presented to the
> GRAND JURY of Caroline County on July 7th, 2010.

CCSO-36, J.A. 348.  However, no written statement from Walker exists.  Ellett testified at his deposition that it took a "day or two" after he was assigned to the case on July 7 to meet with Walker, who was living in Strasburg, Virginia at the time. *See* Ellett Dep. at 46, lines 1-16; J.A. 520.  The reasonable inference is that Walker never provided Ellett with a signed written statement that Ellett possessed or took to the Commonwealth's Attorney's Office or the Grand Jury on July 7, 2010; that is, Ellett's reference to a signed written statement from Walker is a false, after-the-fact justification for his initiation of the criminal prosecution.  If Walker did provide a written statement, it has vanished from the Caroline County Sheriff's Office.

- 9 -

Ellett's investigative notes state that he talked with Brian Pitts on July 15, 2010, after the indictment and after Cooper was arrested on July 14, 2010. *See* CCSO-42, J.A. 354. In regard to Pitts' statements, Ellett testified at his deposition:

> Mr. Pitts stated that she had the – Cooper had this hammer/hatchet in her possession on that day and that she came around the corner of the residence and – he then amends his statement that he saw it in the passenger seat.
>                          ...

Ellett Dep. at 32, lines 5-9, J.A. 508. A review of Ellett's own notes of his interview with Pitts indicate the unreliability of Pitts' statements. *Id.* Ellett's investigative notes do not indicate specific dates that he obtained statements from Tina Taylor, but Ellett testified at Cooper's trial for attempted malicious wounding that he had spoken on four occasions to Tina Taylor, "two on the day of Cooper's arrest and two occasions after that." Trial Tr. at 65, line 10 to 66, line 17, J.A. 422-23. In other words, Ellett did not talk with either Pitts or Taylor (the supposed "corroborating" witnesses) until after he obtained the indictment on July 7, 2010, and after he had arrested Cooper on July 14, 2010. Ellett's own notes and sworn testimony demonstrate that he did not interview Pitts or Taylor until after he arrested Cooper on July 14, 2010, a week after her indictment on July 7, 2010. The evidence of record is that if Ellett had any information of any kind on July 7, 2010, when he initiated the criminal action against Cooper, he had nothing more than some verbal statement from Walker, possibly third hand. On the current record, as the District Court noted, it is impossible to determine exactly what Ellett will claim at trial that he knew from conversation with

Walker, or from conversation with someone who told him of a statement from Walker, before he initiated the criminal prosecution on July 7, 2010.

Pitts was later convicted of giving false information related to the information he had provided on June 5, 2010, when Sergeant McCarty and Deputy Eichenmiller arrested Cooper for an alleged domestic assault of Pitts. At Ellett's deposition, when asked if he ever became aware at any time before or after Cooper's trial on December 1, 2010 of Pitts being charged with giving a false report, Ellett said "no." *See* Ellett Dep. at 26, lines 5-9, J.A. 502; *also* Ellett Dep. at 26, lines 17-23, J.A. 502. However, Ellett's investigative notes, that he dictated on November 2, 2010, indicate that Taylor told Ellett that Pitts had been charged for providing false statements in regard to the domestic assault case. Ellett's report states:

> TAYLOR then stated BRIAN PITTS had lied on the stand to protect JESSICA COOPER against TAYLOR'S advice. TAYLOR stated the case he had lied in was related to this case because COOPER had been charged with Domestic assault on PITTS when he attempted to restrain her from attacking WALKER. TAYLOR related PITTS has subsequently been charged for providing false statements.

CCSO-44, J.A. 356.

Indicative of the fact that Ellett truly did not care about the truth of what had occurred on June 5, 2010, Ellett never had anyone prepare a diagram or drawing of the property that he could use with any witness in trying to understand what might have occurred. Ellett Dep. at 16, line 20 to 17, line 5, J.A. 494-95. Ellett never formally interviewed Sergeant McCarty or Deputy Eichenmiller, the officers who responded to the scene on June 5, 2010, about what had occurred on June 5, 2010. *See* Eichenmiller Dep. at 17, lines 1-6,

- 11 -

J.A. 534; McCarty Dep. at 17, lines 1-18, J.A. 537. Ellett never obtained the 9-1-1 tapes that had recordings of the two separate calls that Walker and Cooper had made to the 9-1-1 communications officer on June 5, 2010, from the scene of the alleged criminal conduct. Ellett Dep. at 17, line 16 to 20, line 12, J.A. 495-98. Ellett has no credible explanation for why he would not seek information from such obvious sources before initiating a felony charge of attempted malicious wounding against Cooper. Ellett Dep. at 19, line 17 to 20, line 1, J.A. 497-98.

At the trial on December 1, 2010, on the attempted malicious wounding charge against Cooper, Ellett testified  that in his interview with Cooper at the time of her arrest on July 14, 2010, Cooper admitted possession of a hammer/hatchet at the scene of the alleged attempted malicious wounding on June 5, 2010. Ellett's sworn testimony at trial was as follows:

> I asked [Cooper] if she had a hammer/hatchet describing it to her as a half a hammer on one side and half a hatchet on the other. **She admitted to having one.** I asked her if she had it that night in question when she allegedly attacked Ms. Walker. She stated that she was going to be honest, and that she had told sergeant [McCarty] that she had, but he did not charge her with it. [Emphasis added.]

Trial Tr. at 61-62, J.A. 420-21. This was false and perjurious testimony. Ellett was not telling the truth: the recorded interview on which this testimony allegedly is based establishes beyond question that Cooper did NOT admit to having a hammer/hatchet at the Reynolds residence on June 5, 2010. J.A. 522 (Placeholder for the CD Recording of the Interview). No one listening to the recording of their July 14, 2010, conversation could believe that Cooper

- 12 -

admitted that she had possession of a hatchet/hammer on June 5, 2010. Cooper definitively stated that she had a "regular hammer" beneath the seat of her car; Cooper flatly denied having a "hatchet" or "hatchet/hammer." *See* Transcript of Recording, *infra.*

Ellett's Interrogation of Cooper: July 14, 2010

Pertinent parts of the recorded interrogation on July 14, 2010, the CD of which is noted at page 522 of the Joint Appendix, are as follows:

**Starting at 3:28 on Recording, after Arrest, *Miranda* Warning, and immaterial conversation.**

Ellett: What happened with you and the hatchet/hammer when you were over at T Reynolds' house?

Cooper: Nothing – the cops were there, and the cops ...

Ellett: I'm talking about before the cops got there and you came around the corner with it.

Cooper: No, I was on the phone with 9-1-1, that's why I did not get arrested for ...

Ellett: I want you to listen to me for a second, OK.

Cooper: Yeah.

Ellett: You had the hatchet and the hammer. Just listen to me, Jessica, and then you can say whatever it is you want to say, OK? But you had the hatchet/hammer – slash - it was the hatchet on one side and the hammer on the other, right? It's here, it was here at the house one time or another, I've seen it before.

Cooper: Yeah, and...

Ellett: You know what I'm talking about - that weapon.

Cooper: Yes, I know exactly what you're talking about, yes.

Ellett: And, you had it that night when you went over to T's place, over on Ladysmith, OK – well, I'm telling you what I know.

- 13 -

Cooper: Got it.

Ellett: And what I'm trying to clear up with you is this – if you just had it, OK, and you didn't threaten her with it – or try to hit her with it – you just had it- and she felt threatened, that could be a little bit different, OK?

Cooper: OK.  I am going to be honest with you, like I told that Officer – McCarty – sitting there – right there in his car and that's why he said he did not charge me with it.  Brian was there, and me and Brian were not getting along – they all came after me with a hammer, I was on the phone with 9-1-1, or whatever, because they had tricked me about coming over there to get the baby, and everything, and I ended up getting arrested for domestic assault.

Ellett: You're missing, missing what I'm saying  ...

Cooper: And, I told McCarty, I said to McCarty there is a hammer in my vehicle, I said it's right there under that seat.  I said I have not pulled it out.  I have not done nothing. And, McCarty  ...

Ellett: It was the hammer/hatchet?

Cooper: No, it was a regular hammer.  I said I will go and get it for you.  I will show you.  I have not pulled it out.  And, I sat there locked in my car the whole time.  Me and Brian got into it  ...

Ellett: Where is that hammer/hatchet now?

Cooper: Huh?

Ellett: Where is that hammer slash - one side's a hatchet the other side's a hammer.  You said it's  ...

Cooper: I had a regular hammer.  That hammer/hatchet  ...

Ellett: Is it still here?

Cooper: I don't know.  But, I had an actual hammer underneath my seat, that had been there.  And, I told McCarty that, I said it is in my car, I can get it for you.  I can get it out.  He said no – he said you didn't pull it out or anything – I said "No, Sir." And, she tried to say that like I hit her in her face and everything, and everyone there said I never even went over there to her, so  ...

- 14 -

Ellett: Why did Brian have to take that away from you – that hammer/hatchet that night?

Cooper: He never took anything away from me. I never had anything in my hand. His mother, you can go ask them right now, his mother and Abranda, Abranda had a baseball bat, his mom had a hammer. And, I was locked in my vehicle and he was standing right there, preventing them from coming up – hitting my car. I mean you can go ask him, I haven't gone over anything with him, please go ask him. I didn't do nothing, I ...

Ellett: But, you, but around this house, you do have a hammer slash hatchet, if I go look for it, I might find it?

Cooper: I know there was one here a while ago. But, I think, I think you all confiscated it when the house got [unintelligible words] ... I haven't touched her, I've blocked her. But, she kept calling me, she was calling my work.

           ... [Omitted Conversation] ...

Ellett: I'm going to be straight with you, Jessica, I mean, I've talked to everybody that's involved and they saw you with a hammer/hatchet, OK.

Cooper: I swear...

Ellett: Listen, listen – just listen to me, OK? I'm one of those people that if it's not what someone else says it is, and it's something that's a little bit less, then that's something I can work with.

Cooper: Can you give me a lie detector test, I will be more than happy ...

           ... [Omitted Conversation] ...

Ellett: I'm going to be very clear with you right now – having talked to everyone that was there that night – OK - there is no doubt in my mind that you had the hammer/hatchet.

Cooper: I didn't.

Ellett: Now, my question, question ... I want you to
        listen for a second, the question that I have at
        the  end of the day is, is did you really try to
        hit her with it or were you just arguing with it
        in your hands.  'Cause if you are just arguing
        with it in your hands, then, then you weren't
        trying to hit her with it.

Cooper: I never ...

Ellett: If you were trying to hit her with it, then
        that's different.

Cooper: I never took anything out.  I was on the phone
        with  9-1-1.  I dialed 9-1-1.  I sat there on the
        phone  with the dispatcher.

Ellett: Jessica, I've listened to the tapes from that
        night, both of you all, both of you all are
        calling 9-1-1.[5]

Cooper: Yes, and I said ...

              ...  [Omitted Conversation]  ...

**9:05 on Recording**

Ellett: Well, Jessica, I want to be clear with you about
        one  thing: there's no doubt in my mind that you
        had the  hammer/hatchet that night.  Maybe it was
        just a hammer.

Cooper: I had a regular hammer that was hidden under my
          seat.  I never took it out.

Ellett: And, there's no doubt in my mind that you
        probably – probably had it in your hand when you
        came around  the corner –

Cooper: No.

              ...  [Omitted Conversation]  ...

Ellett: We've just gotten to a point, Jessica, where, if
          you'd like to take a polygraph, that's fine, but
        I'm  going to be quite frank with you – I don't
        think you  are going to do so hot on that ole
        polygraph.

---

[5] Cooper notes Ellett's statement that he had listened to the 9-1-1
calls that Walker and Cooper made on June 5, 2010.  Given the
manner in which Ellett conducted the interrogation, however, Cooper
has no idea if Ellett was telling the truth.

```
Cooper: I know I will.  I know I didn't have any object
        in  my hand at all.  I sat in my car once I
        realized it  was escalating – that's when I said,
        can I sit there  and, you know, I called the
        cops, and I said can you  stay on the phone.

Ellett: I'm going to let them transport you.  I'll see
        about  setting up the polygraph, OK. Alright.
```

[Sound of car door closing – end of recording.]

**9:57 on Recording.**

### D. <u>Summary of the Argument</u>

This Court lacks jurisdiction of this appeal because the legal conclusions of the District Court are not at issue.  What Defendants dispute are the factual findings of the District Court, including the District Court's holding that genuine issues of material fact precluded all of the factual determinations necessary for a determinative application of the proper legal standards.

Lippa painted a target on Cooper's back for his deputies to see with his baseless allegations of Cooper trading sex for CA Spencer's dismissal of criminal charges.  Lippa expressed to his deputies his desire to see what happened when his deputies charged Cooper with additional crimes; his lack of concern for guilt or innocence was apparent.  Ellett, dependent on Lippa for his job and career, accepted the challenge of convicting Cooper for attempted malicious wounding; obtaining her indictment on the same day he was assigned to the case.  Ellett revealed the extent of his zeal for Cooper's conviction without regard to the truth when he perjured himself at Cooper's eventual trial. Ellett falsely testified that Cooper admitted possession of the alleged weapon, the "hatchet/hammer."  Ellett's testimony about the alleged admission

- 17 -

was excluded at trial when the Court learned that the prosecution had not turned over to the defense the audio recording of Ellett's interview with Cooper, during which she made her supposed admission. *See* Trial Tr. at 68-71, J.A. 425-28.

Cooper will prove at trial that Ellett, working as Lippa desired, built an entirely fictional case against Cooper, charging Cooper with a felony for which Ellett lacked probable cause or any cause whatever.

### F.    Argument

**This Court lacks jurisdiction of this interlocutory appeal because the District Court correctly held that genuine issues of material fact precluded summary judgment.**

### 1.    Standard of Review

This Court reviews *de novo* the District Court's denial of Defendants' motion for summary judgment on the basis of qualified immunity. In its *de novo* review, this Court accepts as true the facts that Cooper has proffered in the record and all reasonable inferences arising from such facts. As this Court has held:

> We review de novo a district court's denial of qualified immunity. *Johnson v. Caudill*, 475 F.3d 645, 650 (4th Cir. 2007). In doing so, "[t]o the extent that the district court has not fully set forth the facts on which its decision is based, we assume the facts that may reasonably be inferred from the record when viewed in the light most favorable to the plaintiff." *See Waterman v. Batton*, 393 F.3d 471, 473 (4th Cir. 2005) (citing *Winfield v. Bass*, 106 F.3d 525, 533-35 (4th Cir. 1997) (en banc)).

*Hensley v. Koller,* 722 F.3d 177, 181 (4th Cir. 2013).

2. <u>Argument</u>

Defendants raise no purely legal issue.  Defendants do not point to any error of law that the District Court committed.  What Defendants argue in their opening brief is that the District Court misapplied the facts of the case to the applicable law.

On page 14 of their opening brief, Defendants set forth their version of the material facts, claiming that such alleged material facts dictate a conclusion that the principle of qualified immunity bars Cooper's action against Defendants.  The supposed material facts that Defendants set forth, however, are not based on the facts in the record, particularly when viewed in the light most favorable to Cooper.

Defendants first refer to "Walker's statement."  The fact is, however, that there is no "Walker's statement" in the record supporting a probable cause determination that can be found to exist in any detail on July 7, 2010.  Ellett's notes expressly refer to a "written statement", but no such written statement exists.  As the District Court notes, it is impossible to evaluate the factual strength of a written statement that does not exist.  We do know that Walker's statement to the 9-1-1 operator on June 5, 2010, from the scene of the ongoing events, which certainly existed on July 7. 2010, makes absolutely no mention of a hatchet or the swinging of a hatchet.  The 9-1-1 recording, as played at the December 1 trial, captures Walker's statement that Cooper ran up to her and punched her in the face.  Walker at some later date claims her real time statement to the 9-1-1 operator was a lie – that Cooper actually did not punch her in the face, but swung a hatchet at her.  The key fact

- 19 -

of record, however, is that on July 7, 2010, a known existing statement of Walker, that is, her statement to the 9-1-1 operator on June 5, 2010, refutes any finding of probable cause to believe that Cooper attempted to maliciously wound Walker with a hatchet/hammer on June 5, 2010.

As their second point, Defendants claim that Ellett on July 7, 2010, would have had "the notes of the officers who responded to the scene on June 5, 2010." Defendants' citation is to the District Court's Memorandum Opinion, which refers to no part of the record. Mem. Op. at 15, J.A. 581. In point of fact, this was speculation on the part of the District Court, because there is no evidence in the record that Ellett had or used any notes of Sergeant McCarty or Deputy Eichenmiller (assuming that such notes existed) when initiating the criminal prosecution of Cooper on July 7, 2010. Even if the District Court was correct, any alleged notes of the two responding officers are not in the record and can offer no support whatever for the existence of probable cause to charge Cooper with attempted malicious wounding on July 7, 2010.

Defendants' third alleged material fact is "Ellett's belief that it is not uncommon for officers not to recover a weapon from the scene of an alleged crime." Defendants simply are responding to Cooper's contention that if Sergeant McCarty and Deputy Eichenmiller knew of an allegation of attempted malicious wounding with a hatchet/hammer when they responded to the scene, they at least would have looked for the alleged weapon. Had they looked, it is impossible to understand why they would not have found it, if it existed.

Defendants' fourth alleged material fact is "the approval of the Commonwealth's Attorney, who must have reviewed Walker's statement in order to present it to the grand jury." Again, the evidence indicates that there was no written "Walker's statement." Ellett presumably made verbal statements about what Walker allegedly had stated verbally, but they could not have been based on any more than Ellett's alleged understanding of Walker's verbal statement. The reality is that the only evidence that Deputy Commonwealth's Attorney Glen Henkle[6] met with Ellett as part of Ellett's initiation of the criminal prosecution is the deposition of CA Spencer, who clearly was struggling to recall what had occurred on July 7, 2010. *See* Spencer Dep. at 108, line 21 to 109, line 15, J.A. 274-75 ("what I imagine happened in that case ... "). Ellett himself at his deposition never makes any reference to Henkle. Ellett Dep. at 43-44, J.A. 519-20. In other words, in their opening brief, Defendants reject Ellett's recollection that he allegedly met with CA Spencer and, instead, proffer the testimony of CA Spencer that his best recollection was that Ellett met with Henkle. *See* Spencer Dep. at 108-09, J.A. 274-75. The record does not provide an answer to the question of who Ellett talked with in the Commonwealth's Attorney's Office on July 7, 2010.

What the factual record actually establishes as a matter of fact and reasonable inference is that after receiving his assignment on July 7, 2010, Ellett did nothing more than ask the Commonwealth's Attorney's office to prepare the necessary paperwork to obtain an

---

[6] M.G. "Glen" Henkle served as an Assistant or Deputy Commonwealth's Attorney for Caroline County between July 2008 and December 2011.

indictment of Cooper for the attempted malicious wounding of Walker. Ellett understood that he was receiving the assignment in order to charge Jessica Cooper with the felony and that is what he did.

Although Ellett accepted his assignment and personally initiated the criminal prosecution on the charge of attempted malicious wounding without probable cause, his unlawful conduct arose within the context of the defamatory and malicious campaign that Lippa was waging against CA Spencer and Cooper. Lippa has never possessed one shred of credible evidence to support his accusations of a sexual relationship and unlawful collusion against CA Spencer and Cooper. Having made such outrageous and defamatory statements, Lippa sought to justify his inexcusable conduct. Seeking justification, Lippa wanted criminal charges brought against Cooper regardless of the existence of probable cause for the charges to see what CA Spencer would do. *See* Fedder Dep. at 30, line 20 to 32, line 1, J.A. 303-05*; generally* Fedder Dep. at 14, line 8 to 21, line 22, J.A. 292-99; at 25, line 22 to 26, line 3, J.A. 300-01. Lippa believed and stated openly that if CA Spencer continued to dismiss charges against Cooper (regardless of CA Spencer's reasoning), then it would supposedly prove the truth of Lippa's charge that CA Spencer and Cooper were having an improper sexual relationship. *See* Lippa Dep. at 22, lines 2-10, J.A. 308; at 24, line 4 to 26, line 6, J.A. 309-11. Consistent with the recorded threats of Deputy Patrick Blasiol, this became the policy of the Sheriff's Office of Caroline County; the policy of bringing criminal charges against Cooper without regard to probable cause or guilt. *See* Fedder Dep. at 30, line 20 to 32, line 1, J.A. 303-05*; generally* Fedder Dep. at 14, line 8 to 21, line 22, J.A. 292-

99; at 25, line 22 to 26, line 3, J.A. 300-01.  Lippa established the policy and created the environment that prompted Ellett to initiate a felony criminal prosecution against a woman whom he knew was almost certainly innocent; the absence of probable cause was of no concern.  The extent of his misplaced loyalty to his boss was demonstrated by his perjurious testimony to the Circuit Court of Caroline County on December 1, 2010.

### H.  <u>Conclusion</u>

For the reasons stated in this Brief, Cooper asks that this Court affirm the Order of the District Court and remand this action to the District Court for trial.

Cooper also requests her costs on appeal and such other and further relief as is proper.

### I.  <u>Request for Oral Argument</u>

Cooper requests oral argument because of her desire to articulate her contentions with regard to this appeal in the most effective manner possible.

Dated this 12th day of December, 2013.

Respectfully submitted,

JESSICA L. COOPER, By Counsel.

/s/ David R. Simonsen, Jr.
David R. Simonsen, Jr.
Virginia Bar Number 20078
Counsel for Appellant
8003 Franklin Farms Drive, Suite 131
Richmond, Virginia 23229-5107
Tel: (804) 285-1337
Fax: (804) 285-1350
Email: DSimonsenJ@aol.com

<u>**Certificate of Compliance with Rule 32(a)**</u>
**Certificate of Compliance with Type-Volume Limitation,**
**Typeface Requirements, and Type Style Requirements**

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    this brief contains <u>6,462</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    this brief has been prepared in a mono-spaced typeface using <u>Microsoft Word</u> in <u>12 point Courier</u>.

                                        <u>/s/ David R. Simonsen, Jr.</u>
                                        David R. Simonsen, Jr.

                                        *Counsel for Appellee*

Dated: December 12, 2013

## <u>Certificate of Filing and Service</u>

I hereby certify that on December 12, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Alexander Francuzenko
COOK, CRAIG & FRANCUZENKO, PLLC
3050 Chain Bridge Road
Suite 200
Fairfax, Virginia  22030
(703) 865-7480

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Melissa A. Dockery
Melissa A. Dockery
GIBSON MOORE APPELLATE SERVICES, LLC
421 East Franklin Street, Suite 230
Richmond, VA  23219